C. S. DODGE, Appellant, v. GRAIN SHIPPERS' MUTUAL FIRE
INSURANCE ASSOCIATION, Appellee.

**APPEAL AND ERROR:** Brief and Argument—Belated Presentation
1   of Legal Propositions. Appellant must fully develop his "state-
ment of legal points or propositions" in his original brief and
argument. New points or propositions, subsequently raised in a
reply argument, will be disregarded. (Rules, Sec. 53.)

**INSURANCE:** Insurable Interest—Junior Mortgagee—Evidence.
2   Evidence reviewed, and *held* to show such value of mortgaged
property that a junior mortgagee clearly had an insurable interest
therein, in excess of the amount of his policy.

**APPEAL AND ERROR:** Review—Trial to Court—General Dismissal
3   —Presumption. Where, on a trial by the court, the petition is
dismissed without any special finding of fact on any issue ten-
dered, it will not be presumed that the court based its decision on
a proposition of fact having no support in the evidence.

**EVIDENCE:** Opinion Evidence—Value. Testimony touching the
4   value of an incomplete manufacturing plant, by an experienced
builder who had personal knowledge of the value of the labor and
material of which the building was constructed, and who bought
and installed a large part of the machinery therein, is competent.

**INSURANCE:** Avoidance of Policy—Fraud—Evidence. Evidence
5   reviewed, and held wholly insufficient to show any fraud on the
part of the insured as to the condition and character of the prop-
erty, or the nature of the risk.

**INSURANCE:** Insurance Agents—Who Deemed Agent. An insur-
6   ance agent is any person who shall, in any manner, directly or
indirectly, transact the insurance business for an insurance com-
pany. Evidenced reviewed, and held that a brokerage insurance
concern located in a foreign country where the property was
located was shown to have been the agent of the insurer. (Sec.
1750, Code, 1897.)

**INSURANCE:** Avoidance of Policy—Misrepresentation—Non-Par-
7   ticipation Therein by Insured. Avoidance of a policy of insur-
ance may not be predicated on incorrect statements in the policy

concerning the situation and condition of the property and the nature and character of the risk, when the insured made no representations in relation thereto, and the descriptive words of the policy were words chosen by the insurer's agent himself. So held where the agent on his own motion described the risk as a "builder's risk."

**INSURANCE:  Construction of Policy—"Builder's Risk."**   What is a "builder's risk" depends upon the meaning given such term by the insurance world at the place *where the insured property is located and where the policy was issued*—not necessarily at the principal place of business of the insurer.

**INSURANCE:  Insurance Agents—Imputed Knowledge.**   The knowledge of the *clerks and employees* of the agent of an insurance company, acquired in the authorized pursuit of the agent's insurance business, is imputed to said agent, and consequently to the company itself.

**INSURANCE:  Avoidance of Policy—Unoccupied Condition of Property—Knowledge of Insurer.**   Avoidance of a policy of insurance may not be predicated on the claim that the property became vacant and remained unoccupied for a period longer than 10 days, contrary to the terms of the policy, when, with the knowledge of the agents of the insurer, the property remained in the same condition from the date of the policy to the date of the loss.

**INSURANCE:  Construction of Policy—Invalidity ab Initio—Avoidance.**   The fact that a printed clause of a policy of insurance was part of a form in general use, and manifestly intended to apply to a condition not present under the policy in question, may well be given consideration on the question of so construing the said clause that the policy would be void *ab initio.*  So held where the property was unoccupied at the date of the policy and so remained, with the knowledge of the insurer, until loss, the policy containing a general provision avoiding the same if property remained unoccupied beyond 10 days.

**INSURANCE:  Avoidance of Policy—Foreclosure Suits and Filing of Liens—"Knowledge" and "Constructive Notice" Contrasted.**   *Constructive notice* to an owner of insured property—such as is given by the mere filing of a foreclosure suit or lien—is not the equivalent of *knowledge* on the part of such owner of such facts. So held where avoidance of a policy of insurance was sought on the ground that, contrary to the policy, and with the *knowledge* of the insured, foreclosure proceedings were commenced and a mechanics' lien was filed on the insured property.

*Appeal from Ida District Court.*—M. E. HUTCHISON, Judge.

SATURDAY, MAY 13, 1916.

ACTION to recover amount alleged to be due upon a policy of insurance. Policy issued to insure plaintiff's interest as mortgagee in the property insured. Cause tried to the court without a jury. Judgment ˙for the defendant, dismissing plaintiff's petition. Plaintiff appeals.—*Reversed.*

*Charles S. Macomber, McWhinney & Brown* and *Miller & Wallingford,* for appellant.

*Johnston Bros.,* for appellee.

GAYNOR, J.—This is an action to recover an amount alleged to be due on a certain policy of insurance executed and delivered by the defendant to the plaintiff to secure the plaintiff's interest in certain property as mortgagee. The uncontroverted evidence discloses the following facts:

, The plaintiff resides in Lowell, Massachusetts, and was a resident of that city at the time the policy was issued. He held two mortgages on certain buildings and additions owned by the North Ontario Reduction & Refining Company, situated at Sturgeon Falls, Ontario, Canada. Plaintiff's interest in the property consisted of the two mortgages, one of about $4,000 and the other about $5,000, with interest, amounting in all to about $10,000. These mortgages were subsisting valid liens upon the land and improvements at the time the policy was issued, and at the time the fire occurred which destroyed the property. The evidence disclosed that the buildings were partially completed at the time the policy was issued. The end of the building containing the engine and generator was not completed, bricked in, and it was contemplated that the engine house should be joined to the main building, and the main building would have to be opened, to a certain extent, to enable this to be done. Besides, considerable machinery had not been placed in the building. The lower portion of the

building was boarded up, and the doors locked as a matter of protection, owing to the numerous articles of machinery that were loose in the building, and as a matter of protection against loss or injury. The reason for the delay in completing the building seems to be that a roaster placed in the building, while being tested, did not work satisfactorily. The new roaster was to be obtained and placed in the building at an expense of about $2,000. Negotiations were being carried on with a view of procuring a suitable roaster. This was the condition of the building since the February preceding, and at the time the policy was issued. The business for which the building was constructed was not being carried on at the time. It does not affirmatively appear that any business had been conducted in the building prior to the issuing of the policy. It continued in that condition, without a watchman, from the date of the issuance of the policy until the destruction of the building by fire. The policy was issued on the 23d of August, 1909. The building was destroyed on the 1st day of November, 1909.

At the time plaintiff secured his policy of insurance covering his interest under the two mortgages, hereinbefore referred to, the building was covered by a prior mortgage in favor of some third parties, for about $30,000. Plaintiff's policy provided for the payment of $1,000 in case of loss; that is, plaintiff insured his interest in the property to the amount of $1,000. It is to recover this $1,000 that suit is brought. Upon the happening of the fire, due proofs of loss were made, and the defendant refused to pay.

The defendant for answer admits that it is a domestic corporation organized under and by virtue of the laws of this state, for the purpose of writing fire insurance, and its principal place of business was at Ida Grove, Iowa; admits that it issued the policy to the plaintiff; admits that it refused to settle with the plaintiff. The defendant further says and alleges the fact to be that, if said property was totally destroyed by fire, as claimed by the plaintiff, the value of said

property would not exceed the value of the interest of the first mortgage, and says that plaintiff had no insurable interest in the property at the time of loss. Defendant further says that plaintiff misrepresented the fact at the time he applied and obtained the insurance, in that he represented the building and fixtures therein contained as being "in the course of construction," and said policy was issued to the plaintiff as a builder's risk; whereas, in truth and in fact, said property, at the time of the issuance of said policy, and during all times thereafter, had been abandoned, and the windows were boarded up, and the doors locked, and all workmen withdrawn, and no watchman was placed in charge of the building; that, instead of being a builder's risk, the property had been abandoned and deserted. Defendant further says that there was a provision in the policy reading as follows:

"This policy shall be void if the insured has concealed or misrepresented any material fact or circumstance concerning this insurance, or the subject thereof, or if the interest of the insured in the property shall not be truly stated herein, . . . or if the subject of the insurance ceased to be operated for more than 10 days consecutively, or if the hazard be increased by any means within the control or knowledge of the insured, or if any change other than the death of the insured take place in the interest, title or possession of the subject of insurance, or if the building described be or become vacant or unoccupied, and so remains for 10 days."

That, notwithstanding the terms and provisions of the policy, the plaintiff concealed and misrepresented to the defendant the fact that, at the time said policy was issued, said building was vacant and unoccupied, and was in no manner a builder's risk, or in process of construction; that after the issuance of the policy, and notwithstanding its terms and provisions, said plant, its operation and construction, ceased for more than 10 days. The defendant further says, as a matter of defense, that the policy of insurance, among other things, contained this provision:

"If the hazard be increased by any means within the knowledge or control of the insured, the entire policy shall be void."

That, notwithstanding this provision, the property became encumbered by the filing of mechanics' liens; that said liens increased the hazard of the risk.   Defendant further says that the policy contained a provision:

"If, with the knowledge of the insured, foreclosure proceedings are commenced, or notice given of sale of any property covered by this policy by virtue of any mortgage or trust deed, then the entire policy shall be void."

That, with the knowledge of the plaintiff, foreclosure proceedings had been instituted against the property mentioned and described in the policy.

Upon the issues thus tendered, the cause was tried to the court, jury being waived, and judgment entered for the defendant, dismissing plaintiff's petition.   From this, plaintiff appeals.

I.   The contention of plaintiff on this appeal is that the evidence was wholly insufficient to justify the court in entering judgment against the plaintiff; that there was no evidence to support the defendant's contention.   Other specific errors are assigned, but they do not appear in the original argument, and are raised for the first time in the reply.   These, we do not consider.

1. Appeal and Error: brief and argument: belated presentation of legal propositions.

There is practically no dispute in the evidence.   Our duty is to determine what the rights of the parties are under a record in which there is no substantial dispute touching any fact material to a proper determination of these rights.   The determination of the case, therefore, involves the application of the law to the facts.

We recognize the rule that, in all law actions in which a jury is waived and the cause tried to the court, the finding of the court upon disputed facts has the same force and

effect as is given to the verdict of a jury, and it will not be disturbed unless the finding is clearly against the evidence.

We divide the consideration of this case into five parts, and these several parts involve, we think, all the controversy that this record provokes: (1) Does the record show that the property destroyed by fire was not in excess of the first mortgage, and that, therefore, plaintiff had no interest in the property to be damaged by the destruction of it? (2) Does the record show fraud and misrepresentation on the part of the plaintiff as to the character of the risk insured? (3) Does the record show that the buildings in controversy became vacant and unoccupied and remained so for a longer period than 10 days, in violation of the terms of the policy, and did the policy on account thereof become void? (4) Had the buildings been abandoned in such a sense that, under the provision of the policy, the 10 days' limit applied, rendering the policy void? (5) Did the filing of the mechanics' lien and the commencement of foreclosure proceedings under the first mortgage render the policy unenforceable and void under the terms of the policy?

On the first proposition, touching the value of the property covered by this policy, the record discloses that the plaintiff's testimony was taken. He testified:

2. INSURANCE: insurable interest: junior mortgagee: evidence.

"I was a stockholder in the North Ontario Reduction & Refining Company; was a director and also an employee. I have personal knowledge of the property. I was on the ground three months and over. The last time I saw the property before the fire was in March, 1909. My knowledge of values is personal, based on years of experience as a builder, and also I bought and installed the greatest part of the machinery in this plant. I knew the prices of lumber that went into the building and the cost of some other material. Also the cost of the labor. . . . My interest in the property as mortgagee was $9,000. The property was worth, before the fire, from $60,000 to $65,000. After the fire, from $2,500 to $3,000."

He was asked this question:

"You may state whether or not the property insured was worth more or less than the encumbrance on it at the time the defendant company issued you the policy sued upon.   A. About $15,000 to $20,000 more than all the encumbrance. . . . The value of the property destroyed by the fire was greatly in excess of the first mortgage at the time of the issuing of the policy, and also·at the time of the fire.   The amount of excess would approximately be the same at the time the policy was issued and at the time of the fire. . . . The buildings cost from $50,000 to $60,000.   I became personally acquainted with the fair, actual market value of the property for the purposes for which it was intended, and for which it was attempted to be completed, before I accepted a mortgage upon it.   The value of the property as a whole; that is, the actual market value including land, buildings and machinery, was about $75,000.   There was a first mortgage ahead of mine of about $25,000."

This is all the evidence touching the value of the property, and we think it shows conclusively that there was a balance in the destroyed property, in which plaintiff had an interest before its destruction under his mortgage, and which was lost to the plaintiff by the fire, exceeding the amount of this policy, and that plaintiff, at the time of the loss, had an insurable interest in the property exceeding the amount of the policy issued.

We might remark here that the court made no special finding of fact, but dismissed plaintiff's petition without announcing a finding on any fact involved in the issues tendered.   This necessitates a review by us

3. APPEAL AND ER-ROR: review: trial to court: general dismissal: presumption.

of all fact questions upon which the court's decision could find a substantial and proper basis for resting.   If, upon the record submitted, we find that there is no substantial basis in the evidence for the holding against the plaintiff, upon the proposition submitted, we must assume that, on this propo-

sition, at least, the court did not find adversely to the plaintiff, nothing appearing in the record to the contrary.

Plaintiff's testimony touching the value of this property, though in the nature of an opinion or conclusion, was competent. The witness from every point of view sustained his competency, and the evidence is affirmative

**4. EVIDENCE: opinion evidence: value.** that no substantial change had taken place in the property from the time it was seen and known of by him, and the time when the policy issued, and the time when the fire occurred. His testimony shows that he had years of experience as a builder; that he had personal knowledge of the values of the things that went into the composition of the building; that he bought and installed the greater part of the machinery; that he knew the cost of the labor that went into its construction. The witness was competent, his testimony was competent, and it establishes the fact that plaintiff had, at the time of the destruction of the building, an insurable interest in the building, in excess of the amount covered by his policy. As bearing upon the question of the competency of this evidence, see *City Nat. Bank of Columbus v. Jordan,* 139 Iowa 499; *Clark v. Ellsworth,* 104 Iowa 442; *Jeffries v. Snyder,* 110 Iowa 359.

Upon this proposition, we cannot hold that the court found against the plaintiff, or that he justified his holding against the plaintiff upon an adverse finding upon this proposition.

II. This brings us to a consideration of the second proposition: Does the record show fraud and misrepresentation on the part of the plaintiff as to the character of the risk?

**5. INSURANCE: avoidance of policy: fraud: evidence.** There is absolutely no showing of any affirmation on the part of plaintiff, or those representing plaintiff, touching the character of this property, its condition, or the character of the risk to be insured. Plaintiff held two mortgages upon property valued at $60,000 to $70,000. His mortgages aggregated about $10,000. There

was, at the time, a first mortgage of about $30,000. He insured in defendant company only $1,000 of the $9,000 or $10,000 interest that he had in the property under his mortgages. The record discloses that he resided in Lowell, Massachusetts; that he did not make personal application for this insurance; that the defendant company was organized and incorporated under the laws of this state, and had its principal place of business at Ida Grove in this state; that Charles E. Ring & Co., of New York City, were the accredited agents of the defendant company, and were authorized to represent the company within the territory occupied by the property in controversy. The authority granted by the defendant to this company was in writing, and the power delegated in the following words:

"The Grain Shippers do hereby authorize and empower the said attorneys in the name of said company to sign and issue policies as shall be supplied to said agents from time to time, the company reserving the right to cancel or decline any risk written by said agents."

Power was also given to receive premiums and to receipt for them in the name of the company. Charles E. Ring & Company consisted of Charles E. Ring.

Touching the issuance of this policy, one Charles McLean Stinson was called to testify, and said he resided at Toronto, Canada; that he was a member of the firm of Stinson, Brody, Ring & Co., insurance brokers; that he was president of this company; that this company procured the policy in suit upon the property in controversy; that he was also president of McLean Stinson & Brody Co., at the same time; that the latter company owned and controlled Stinson, Brody, Ring & Co., as its brokerage department; that the insurance business conducted by Charles E. Ring & Co., of New York, was owned and managed by McLean Stinson, Brody, Ring & Co., at the time the policy was issued; that Stinson, Brody, Ring & Co. acted as brokers in placing this insurance; that McLean

6. INSURANCE: insurance agents: who deemed agent.

Stinson & Brody Co. owned and controlled all the business carried on by Chas. E. Ring & Co.; that Stinson, Brody, Ring & Co. and McLean Stinson & Brody Co. were incorporated bodies; that Stinson, Brody, Ring & Co. sent the wording of the policy to the New York office, then conducted by Chas. E. Ring, to place the line of insurance in question; that both McLean Stinson & Brody Co. and Stinson, Brody, Ring & Co. acted in procuring the insurance in controversy. The relationship between McLean Stinson & Brody Co. and Chas. E. Ring & Co. was in writing. The writing provided that Charles E. Ring & Co. should act as manager for McLean Stinson & Brody Co., and he acted as their agent in New York City; that the business to be done by the company and by its agents and managers should be a general insurance business, and included the making of contracts of insurance, receipts for all premiums, etc., and was signed "McLean Stinson Co.," meaning "McLean Stinson & Brody Co.," and Charles E. Ring for Charles E. Ring & Co. The premium on the policy in suit was paid to Stinson, Brody, Ring & Co., and by it paid to McLean Stinson & Brody Co., which last company credited it to its New York office and to the defendant company, and paid the defendant company on its account of August, 1909. The defendant passed a sight draft on McLean Stinson & Brody Co. for the balance of its August, 1909, account. The testimony further shows that Charles McLean Stinson, though not a member of the firm of Charles E. Ring & Co., was interested therein as president of McLean Stinson, Brody Co., which owned and operated the business of Charles E. Ring & Co. in New York. It further appears that Charles E. Ring was, during 1909, in Toronto, acting as managing director of McLean Stinson, Brody & Co.

Charles McLean Stinson, president of two of the companies before referred to, testified that he had personal knowledge of the risk in controversy from February, 1909, until the date of the fire; that, as agent for other companies, he had

placed risks upon this property; that he obtained information from the agents of other companies at Sturgis Falls, from the inspector of the Rimouski Fire Insurance Co., from attorneys at Toronto, and from the Underwriters' Fire Insurance Co. at Toronto. He further testified that the property had not been abandoned at the time the policy was issued, nor at the time of the fire; that the owners were in possession of it. He further testified:

"Sometime in February or March, 1909, I first became familiar with the physical condition of this risk, and certain lines of insurance for Mr. Dodge were accepted by insurance companies for which my firm, McLean Stinson & Brody, acted as general agent, and from that date until the time of the fire I was aware of the condition and that the plant was in an uncompleted state."

He said that, at the time the policy was issued, he would call it a builder's risk—a building in the course of construction; that the risk was properly described as a builder's risk, and in the course of construction; that it is held as a builder's risk as long as there is not an actual abandonment of the property; that he, for his firm, knew the exact condition of the building at the time they directed the wording of the policy; that the property covered by this insurance was still what is called, in technical insurance terms, "a workman's or builder's risk;" that Stinson, Brody, Ring & Co. acted as brokers in placing this insurance; that he, as a member of Stinson, Brody, Ring & Co., had personal knowledge of the character of the risk at the time the policy was issued.

The record further discloses that Messrs. Burruss and Sweatman negotiated for the insurance in controversy with the employees of McLean Stinson & Brody Co., in the first instance, and was by it referred to the employees of its brokerage department, Stinson, Brody, Ring & Co.; that, when the policy was issued, the premium was paid to Stinson, Brody, Ring & Co., and by it to McLean Stinson & Brody Co.; that

the defendant had an account with the latter company for insurance premiums, and drew drafts on the company. Among the drafts drawn was a draft for the August, 1909, settlement, which included the premium on the policy in question.

We think the record shows that these companies were acting for and on behalf of this defendant company in procuring this insurance; that they issued the policy and collected the premiums for the defendant company; that defendant recognized their right to do this by consenting to the issuing of the policy, and accepting the premiums collected by these companies from the plaintiff therefor, and by receiving such premiums in due course of business.

Our statute, Section 1750 of the Code of 1897, provides:

"The term 'agent' . . . shall include any other person who shall in any manner directly or indirectly transact the insurance business for any insurance company complying with the laws of this state. Any officer, agent or representative of an insurance company doing business in this state who may solicit insurance, procure applications, issue policies, adjust losses or transact the business generally of such companies, shall be held to be the agent of such insurance company with authority to transact all business within the scope of his employment, anything in the application, policy, contract, by-laws or articles of incorporation of such company to the contrary notwithstanding."

Charles McLean Stinson, president of both companies, Stinson, Brody, Ring & Co. and McLean Stinson & Brody Co., had full knowledge of all the facts touching this risk, the nature and character of the risk, its situation, and the condition in which it was at the time of the issuance of the policy. Plaintiff made no representations, to secure the risk, touching the character of the risk. With this knowledge, the policy was prepared by these companies, or one of them, and attested by Charles E. Ring & Co., accredited agents of the defendant Charles E. Ring & Co., at the time being owned, controlled and managed by McLean Stinson, Brody & Co. These com-

panies, or one of them, prepared and delivered the policy to the plaintiff, just as it is now written. They received the premium from the plaintiff, paid the premium to the defendant company, and it is still retained by it.

Plaintiff had an insurable interest in this property. Assuming that the character of the risk was not correctly described in the policy, it is not a matter of which this defendant can complain. The fault does not lie in

**7. INSURANCE: avoidance of policy: misrepresentation: nonparticipation therein by insured.**

the plaintiff, but in the representative of this defendant. In preparing the policy, they chose the terms in which the risk should be described; they presented it to the plaintiff as their contract of indemnity. The defendant accepted the premium upon the contract so made, and retained the same. If we should find that the insurable interest of the plaintiff in this property was not correctly described, we find that such misdescription was not the result of any fraud practiced by the plaintiff, or the result of any concealment or misrepresentation made by him. We think that the company is bound by its chosen words, and we must assume that the premium was regulated thereby, and it cannot now be heard to say that the misdescription rendered the policy void *ab initio*.

However, we may go further and say that we think that the practically undisputed evidence shows that this risk was, in the language and parlance of the insurance world at

**8. INSURANCE: construction of policy: "builder's risk."**

the time this policy was issued, known as a "builder's risk," and that there was no misdescription in fact. True, there is some evidence that in Iowa it would not be known as a builder's risk. That is not the question, however. The question is, What did the people at the place where the contract was made know and understand these words to mean? That is the controlling question; and if the parties whose minds met upon this proposition at the time the policy was issued, and where it was issued, knowing its then condition, understood it to be a builder's risk, and, as such, undertook to

insure it, and did insure it as such, the defendant cannot complain that in other jurisdictions a different meaning would attach to the words than the parties themselves attached to it, and thereby defeat the policy.

As bearing upon the question of agency, see *Bennett v. Council Bluffs Ins. Co.,* 70 Iowa 600. In this case, one Bennett obtained a policy of insurance in defendant company. One Salot was defendant's agent. This agent

9. INSURANCE: insurance agents: imputed knowledge.

directed his clerk to solicit a fire policy of the plaintiff. The clerk did this, and Salot issued the policy. The clerk learned, before the policy was issued, that the plaintiff carried other insurance, but did not communicate this fact to Salot. Defendant urged other insurance as a defense in the suit, alleging that it had no notice of the other insurance; that other insurance violated the policy; that neither it nor its agent Salot knew of this; that what the clerk learned was neither communicated to the agent nor to the defendant. The court held the defendant bound by the knowledge of the agent's clerk, and held that, if the clerk had full knowledge that there was other insurance on the property at the time he procured the application and the policy was issued, and this fact was not communicated to Salot, it appearing that Salot's clerk had power and authority to solicit the insurance, procure the application and collect the premium and deliver the policy, the defendant was thereby bound by the knowledge obtained by the clerk while so engaged, and, having issued the policy with such knowledge, it must be held to have waived that condition of the policy.

See, also, *London & Lancashire Fire Insurance Co. v. Gerteson* (Ky.), 51 S. W. 617. In this case, a fire policy was solicited by a subagent, who knew that the assured was not the absolute owner of the property, but who did not communicate this fact to the defendant's agents who issued the policy. The court held that the knowledge of the subagent would be imputed to the defendant. In that case, it was said:

"It is usual for insurance agents who issue policies to

send out solicitors to take applications on which the policies may be issued, and authority to do so may be inferred, nothing appearing to the contrary, for this is the common way the business is done.''

And it was said that, when a subagent came to the plaintiff and took his application and obtained the policy of insurance, the assured had a right to regard him as the agent of the company for this purpose, inasmuch as the company accepted the application, issued the policy and kept the premium, and it was said that, under such circumstances, the company is estopped to say that his act was unwarranted, and if it takes the benefits, it must also take the burden.

See, also, *Wilson v. Anchor Fire Ins. Co.*, 143 Iowa 458, and authorities therein cited.

A case very much like the one under consideration, both in principle and in fact, is *Indiana Ins. Co. v. Hartwell* (Ind.), 24 N. E. 100. This very pertinent remark appears in that opinion:

''But, under the transaction in question, the appellee (plaintiff) pays the premium that is required by the appellant, and receives his policy. How are the agents or parties who have figured in the transaction, and through whom it is closed up, paid for their services? They are paid by the appellant (defendant in this case). What for? For the benefit which it has received from their services. The appellant (defendant in this case) received just 20 per cent. less from the risk than it would have received if the appellee (plaintiff in this case) had gone to it direct and obtained the policy; but the appellee paid no more than if he had procured the policy direct from the appellant. Upon principle, we can see no reason for drawing a distinction between an insurance broker who procures a risk which is adopted and accepted by an insurance company, and where the insurance is effected by a commissioned agent, so far as their relations to the company are concerned. In either case, what is done is the authorized act of the company, and for the services rendered the company

responds. Insurance companies are not only responsible for the acts of their agents within the scope of their agency, but also for the acts of the agent's clerks, when the company knew, or ought to have known, that other persons would be employed by and act for the agents. Insurance brokers are the agents of insurance companies for the purpose of delivering policies and collecting premiums''—citing *Duluth Nat. Bank v. Knoxville Fire Ins. Co.*, 1 Pickle (85 Tenn.) 76 (1 S. W. 689), from which the opinion quotes as follows: ''Not only is the insurer responsible for the acts of its agent within the scope of his agency, but also for the acts of its agents, clerks or any person to whom he delegates authority to discharge his functions for him. Of course, the act must be done by some person authorized expressly or impliedly by the agent, and under such circumstances that the insurer knew, or ought to have known, that other persons could be employed by and to act for the agent.''

See, also, *McArthur v. Home Life Assn.*, 73 Iowa 336. In this last case, it was held that the name of the one who assumed to act as agent was endorsed on the policy. The defendant knew, when it accepted the application and issued the policy, that Hair claimed to act as defendant's agent and procure the application. The defendant received from the insured all the dues and assessments due the company, according to the terms of the policy. Having received and enjoyed the benefits of Hair's act, it could not be permitted to say that he was not its agent.

In the case at bar, the application was made to Stinson, Brody, Ring & Co., and the policy was issued. The premium was paid to this company, and by it turned over to McLean, Stinson, Brody & Co. The defendant drew upon this last company for the amount of the premium. The president of both of these companies had full knowledge of all the facts touching this risk. We think that the second proposition must be answered against defendant's contention.

III and IV. This brings us to the third and fourth prop-

ositions. We treat these two propositions together. Does the record show that the buildings in controversy were abandoned or became and remained unoccupied for a period longer than 10 days, in violation of the terms of the policy?

10. INSURANCE: avoidance of policy: unoccupied condition of property: knowledge of insurer.

The buildings remained in the same condition from the time of the issuance of the policy until the fire. There was no change in the condition or occupancy of the buildings. This was known to Charles McLean Stinson. It was treated and insured as in process of construction. We must assume that the parties did not intend the building to be occupied until construction was completed. This is a natural and necessary inference from the conditions disclosed by this record. So far as this record shows, the building was not in a condition for occupancy at the time the policy was issued, and was not in a condition for occupancy up to the time of the fire, in November, 1909. We cannot think that it was the intention of the parties that, because of this condition, the policy should be void *ab initio*. It would be if the construction contended for by the defendant were to be adopted. In one sense, it was unoccupied. It was a builder's risk. It was in process of construction, and insured as such.

The assurer, through its proper agents, knew that the property was as vacant at the time the policy was issued as it was at the time of the loss. It knew that the property was in process of construction. They insured it as such. The policy provides:

"This entire policy shall be void if the subject of this insurance ceases to be operated for more than 10 consecutive days."

The defendant knew that the property was not being operated at the time the policy was issued, and knew that time would be required to complete it so that it could be operated. We cannot hold that, with this knowledge, it was the intention of the insurer, by inserting this clause in the

policy, to make the policy absolutely void because of the known condition then existing, and to the existence of which it impliedly consented. The policy further provides:

"Or if the buildings herein described, whether intended for occupancy by the owner or tenant, be or become vacant or unoccupied, and so remain for 10 days, the policy shall become void."

The purpose of entering into a contract of insurance is to secure indemnity. The purpose is to secure and to give indemnity. It cannot be though that parties enter into a written, solemn contract to give and to receive indemnity, and, at the same time, intend that the contract should be null and void and ineffectual to secure or to give. Every contract should be so construed as to make effectual, to the fullest extent, the intention of the parties, and no policy should be so construed as to defeat the obvious intent. It should be construed to make it effectual for the purposes for which the contract was made, rather than such as would avoid the contract. If the words used are susceptible of a rational and intelligent meaning, which is consistent with the object and purpose evidenced by the entire policy, that is the meaning that should be given to the words. The general rule is that the intention is to be obtained first from the language of the entire policy, in connection with the risk or subject-matter. The law will not tolerate such shifting of responsibility. "It finds no sanction in that sturdy morality which should underlie every system of jurisprudence." This provision undoubtedly was in the form of policy in general use by the defendant company, and was in printed form. This does not destroy the efficacy of the provision, but is a matter to be considered when we are called upon to forfeit the particular policy because of its wording.

11. INSURANCE: construction of policy: invalidity *ab initio*: avoidance.

As bearing upon this question, see *Walrod v. Des Moines Fire Ins. Co.*, 159 Iowa 121; *Funk v. Anchor Fire Ins. Co.*,

171 Iowa 331. As said in *Gurnett v. Atlas Mut. Ins. Co.,* 124 Iowa 547:

"The principle is well settled that, when an insurance policy contains a condition which renders it void at its inception, and this is known to the insurer, it will be held to have waived such condition by receiving the premium and issuing its policy."

We think that the third and fourth contentions were not available to the defendant under this record.

V. This brings us to the fifth proposition: Did the filing of the mechanics' lien and the commencement of foreclosure proceedings under the first mortgage render the policy unenforceable and void under the terms of the policy? The provision of the policy relied on by the defendant reads as follows:

12. INSURANCE: avoidance of policy: foreclosure suits and filing of liens: "knowledge" and "constructive notice" contrasted.

"If the hazard be increased by any means within the control or knowledge of the insured, or if, with the knowledge of the insured, foreclosure proceedings be commenced, or notice given of the sale of any property covered by this policy, the policy shall be void."

This provision of the policy was prepared by the defendant company, and, no doubt, advisedly so, with the full understanding of the legal meaning of the words used. There is evidence that there was a friendly proceeding instituted to foreclose the first mortgage after this policy of insurance had been issued. There is evidence that there was a mechanics' lien filed. The evidence shows, touching the mechanics' lien, that it was a fraudulent claim, or, at least, was so considered by the owners of the property; that it was not based on any indebtedness from the company to the party filing the lien. To defeat the policy on this ground, it must affirmatively appear that the mechanics' lien was filed and the foreclosure proceedings commenced *with the knowledge* of the insured. There is no evidence that he had any knowledge of this pro-

ceeding, or of the filing of the lien, or that he had any control over the action of the party in either case.

We had occasion to construe a provision such as this in *Funk v. Anchor Fire Ins. Co.*, 171 Iowa 331. In that case, and in this, there was no evidence that the assured had any knowledge of the commencement of the foreclosure suit. The word "knowledge" is distinguished from constructive notice. The right to forfeit given by the policy was limited to those cases in which the insured had knowledge of the commencement of the foreclosure proceedings. Knowledge implies actual notice, as distinguished from constructive notice. It is true that the assured was a director in the North Ontario Reduction & Refining Co., the owner of the property covered by plaintiff's mortgage. Constructive notice does not necessarily imply knowledge. The plaintiff lived in a distant state. It is not shown that he had any knowledge of the commencement of this proceeding, or of the filing of the mechanics' lien.

Under the holding in the *Funk* case, supra, we must hold that there is a total failure of proof upon this point. There is no claim that the mortgagee took possession, or that the owner had been disturbed in the possession by the mortgagee. There is no evidence that notice of the commencement of the suit was served upon any officer of the owner of the property. All that this record disclosed on this point was testimony given by Charles McLean Stinson, in which he said:

"I was aware that the first mortgagee had commenced foreclosure proceedings under the mortgage, but these proceedings were friendly, as the first mortgage was held in trust for Mr. Gillies, president of the owner company."

But of this, the record does not disclose any knowledge on the part of the plaintiff.

Under the whole record, we think that the court erred in finding for the defendant; that, under this record, judgment should have been for the plaintiff, and the case is therefore—*Reversed* and *Remanded*.

EVANS, C. J., LADD and SALINGER, JJ., concur.