GERRIT DEN HARTOG et al., Appellees, v. HOME MUTUAL INSUR-
ANCE ASSOCIATION OF IOWA, Appellant.

INSURANCE:  Reformation of Policy.  A policy of insurance may be
1    reformed so as to carry out the intention of the parties when there
is clear and convincing evidence of a mutual mistake, or of a mis-
take due to the negligence of the agent of the insurer, acting
within the scope of his employment.  So held where the evidence
showed that there were two owners of the insured property (which
had been destroyed by fire), and that, through mistake, in copying
from an old insurance policy, the agent inserted in the application
for the new policy the name of only one of the owners.

INSURANCE:  Right to Avoid Policy.  The insured is not guilty of
2    negligence because he signs the application in blank, without read-
ing it, when this is done at the request of the agent, and no oppor-
tunity is ever given him to read the completed application.

*Appeal from Marion District Court.*—HARRY S. DUGAN, Judge.

FEBRUARY 5, 1924.

SUIT in equity, to correct a statement in application for a
fire insurance policy, and praying that the application be so
reformed as to recite the true intent of the parties and insure
both plaintiffs Den Hartog and Neal Jabaai as owners of the
property, instead of insuring only Gerrit Den Hartog. Decree
was entered reforming the contract, and judgment was entered
under the reformed contract for damages sustained by destruc-
tion of a dwelling house by fire.  Defendant appeals.—*Affirmed.*

*Ray A. Emmert,* for appellant.

*De Reus & Van Zante,* for appellees.

ARTHUR, C. J.—I.  The main and controlling proposition
in the case is what was the intent of the parties, and whether or
not the policy of insurance should be reformed.  Other questions
are subsidiary to the main question.

The property which was destroyed by fire was owned
jointly by plaintiffs Den Hartog and Neal Jabaai.  The policy
in question insured the property in the name of Den Hartog as

sole owner. Plaintiffs' claim is that the policy failed to express the true contract between the parties; that the intention of the parties was to insure both Den Hartog and Jabaai as owners of the property; and that, by mutual mistake and by negligence of defendant's agent, the contract expressed Den Hartog as being the sole owner of the property, instead of Den Hartog and Neal Jabaai as being joint owners of the property. Defendant denies that there was mutual mistake, and denies that Van Houweling, defendant's agent, was negligent in writing the application.

Prior to March 5, 1920, plaintiff Peter Van Hemert was the owner of an 80-acre farm, on which the building destroyed by fire on July 11, 1921, was located. Den Hartog and Jabaai purchased the farm from Van Hemert sometime prior to March 5, 1920, and Van Hemert assigned to Den Hartog and Jabaai a policy of insurance in a company other than defendant company, upon the house and barn located on the farm, which assignment was approved by the company. This policy expired March 1, 1921.

II. Den Hartog testified that, sometime prior to March 1, 1921, he and Jabaai agreed on taking out new insurance, as the policy assigned to them by Van Hemert would expire March 1, 1921; that in February he met Van Houweling, agent of defendant company, and told him "we were wanting to take out insurance on a farm I had at Otley. I spoke to Van Houweling and told him we were intending to take insurance," and that "Mr. Jabaai, my brother-in-law, would come to Pella about the 1st of March and pay my rent, and we would take out insurance at that time." Witness further stated that, on March 1, 1921, he again mentioned Jabaai to Van Houweling, telling him that they had been looking for him, and that they had been talking about taking insurance, and arranged that they would take less insurance on the house and more on the barn. In this conversation Den Hartog said to Van Houweling, "We bought the place." In the conversation on the 1st of March, Den Hartog told Van Houweling that "we had been looking for him and could not locate him;" that "my brother-in-law, Neal Jabaai, has gone home,—he has lots of work at home." Witness further testified that he told Van Houweling that he would take him to

the farm and "we will fix it up then and take out insurance;" that Van Houweling then asked him if he knew the size of the buildings, and he told him "no;" that Van Houweling then said, "If you only had the size of the buildings, it would save us a trip out there;" that Van Houweling then said, "If we only had that old policy, we could see everything from that;" that he then told Van Houweling that he had the old policy, and Van Houweling said, "Then we will go and fix it right up;" that he furnished him the old insurance policy; that he answered all the questions Van Houweling asked him, and relied upon him as an insurance agent, and gave him all the data that he asked for concerning the property; that he paid assessment on the insurance for himself and Jabaai; that, in procuring the insurance, he acted for himself and Jabaai; that he signed the application at Van Houweling's request, without reading it; that he gave Van Houweling the old policy, at Van Houweling's request, from which Van Houweling wanted to make out the new policy; that his intention was that he and Jabaai should both have insurance; that he signed the application in blank; that he believed when he signed the application that Jabaai's name had been placed in it by the agent.

Van Houweling, who was the agent of defendant and negotiated the insurance, testified that he met Den Hartog in Pella; that Den Hartog said he had decided to take out insurance, and spoke of his brother-in-law, Jabaai, and spoke something about his brother-in-law's being in Pella and looking for him, and that he went back home; that he and Den Hartog talked about going out to see the place; that he inquired whether it would be necessary to go out and see the property or not, and said to Den Hartog that, if he had the size and location of the property and the estimation of value, etc., the insurance could be fixed up that day; that he inquired of Den Hartog if he had an old policy which he could copy from, and he said he had, and handed him the old policy; that he, Van Houweling, then said to Den Hartog, "We can fix that up right now;" that Den Hartog told him he wanted a $2,000 policy, $800 on the house and the rest on the barn and other buildings; that "upon that I told him if he would sign the application that would let him off, that I thought I could copy it off, the balance of what I needed, off

the old application, and I thought it was not necessary to wait any longer, and he [Den Hartog] signed the application;'' that he asked Den Hartog whether there was a mortgage on the farm, the amount, and whether there was any other insurance on the property, which questions Den Hartog answered; and that ''then I told him that will be sufficient,—I can take it from the old policy.''

In relating the conversation between him and Den Hartog, Van Houweling further said:

''I could not state under oath that Mr. Den Hartog told me or wrote to me that he was the sole and only owner. I could not state to the court that he said nothing about Mr. Jabaai having a joint interest. I do not know whether the plaintiff Den Hartog or anyone had an interest except himself. I would not want to swear one way or the other. I did not ask him all the questions on the application.''

In speaking of the data which was furnished by the applicant, Van Houweling testified that he told Den Hartog, ''If we only had the old policy, we could take everything from that.'' Witness further testified:

''The application was signed in blank, and I did all the filling afterwards; and I had the old policy before me, and examined it and took my data from it. I did not see the assignment there by Peter Van Hemert. The old policy was left to prepare from.''

III.   It is well settled that a policy of insurance, like any other contract, may be reformed to carry out the intention of the parties, where there is clear and convincing evidence that mutual mistake has been made.   *Fritzler v. Robinson,* 70 Iowa 500; *Jamison v. State Ins. Co.,* 85 Iowa 229; *Carey v. Home Ins. Co.,* 97 Iowa 619; *Fitchner v. Fidelity Mut. Fire Assn.,* 103 Iowa 276; *Salmon v. Farm Property Mut. Ins. Assn.,* 168 Iowa 521; *Norem v. Iowa Imp. Mut. Ins. Co.,* 196 Iowa 983.

1. INSURANCE: reformation of policy.

It is also well settled that, in case a mistake is made, due to the negligence of the agent of the insurer, acting within the scope of his employment, a satisfactory ground for reformation is present.   *Salmon v. Farm Property Mut. Ins. Assn.,*

*supra*; *Jamison v. State Ins. Co.*, supra; *Carey v. Home Ins. Co.*, supra; *Fitchner v. Fidelity Mut. Fire Assn.*, supra.

Courts have recognized the fact that the insured ordinarily relies upon the agent to properly set out in the application the facts given him.   *Fitchner v. Fidelity Mut. Fire Assn.*, supra; *Pfiester v. Missouri St. Life Ins. Co.*, 85 Kans. 97 (116 Pac. 245, L. R. A. 1915 A 275, note).

2. INSURANCE: right to avoid policy.

It is universally held, so far as we have discovered, that the insurer will not be permitted to avoid the policy by taking advantage of a misstatement in the application, material to the risk, which is due to mistake or negligence of its agent, and not to fraud or bad faith on the part of the insured. *Young & Co. v. Hartford Fire Ins. Co.*, 45 Iowa 377; *Stone v. Hawkeye Ins. Co.*, 68 Iowa 737; *Dodge v. Grain Shippers' Mut. Fire Ins. Assn.*, 176 Iowa 316.

IV.   We think Den Hartog was not guilty of negligence in signing the application in blank, upon request of the agent. *Fitchner v. Fidelity Mut. Fire Assn.*, supra.   The application was signed in blank by Den Hartog, and filled out by the agent from data furnished him, and Den Hartog never saw the completed application.   Under this situation, we think the company is estopped from asserting misrepresentation.

It can hardly be said that the evidence is conflicting.   Appellee Den Hartog as a witness relates the transactions occurring previous to and on March 1, 1921.   Van Houweling, appellant's agent, in his testimony does not directly deny any of the statements made by Den Hartog.   What Van Houweling does remember of the transaction affirms Den Hartog's testimony.   The record disclosed that Den Hartog and Jabaai jointly owned a farm which they purchased from Peter Van Hemert. Jabaai was in possession of the farm, paying a rental to Den Hartog for use of Den Hartog's undivided one-half interest in the farm.   The insurance policy held by Van Hemert and assigned to Den Hartog and Jabaai would expire on March 1st, and Den Hartog and Jabaai were considering taking out new insurance.   With this in mind, Den Hartog talked with the agent, Van Houweling, during the latter part of February, 1921, about taking out new insurance.   Den Hartog said to the agent:

"We were wanting to take out insurance on a farm I had at Otley; we were intending to take out insurance. Mr. Jabaai, my brother-in-law, would come to Pella about the 1st of March and pay my rent, and we would take insurance at that time."

Counsel for appellant, with some plausibility, argues that Den Hartog's statement to Van Houweling that "Jabaai would come to Pella to pay rent, and we would take insurance at that time," might have been taken by Van Houweling to mean that Den Hartog wanted to get the rent from Jabaai before taking out insurance, and that, in the statements made by Den Hartog the next day, that "we have been looking for you, and could not locate you," and that "my brother-in-law has gone home," there is nothing to impart knowledge that Jabaai owned a one-half interest in the farm. Also, it is argued that, when Den Hartog mentioned "a farm I had at Otley," and "my rent," the agent was justified in concluding that Den Hartog was the sole owner of the land and buildings thereon.

We think there is nothing unusual in a man's referring to a farm in which he has an undivided interest as "the farm I own;" nor is it unusual for a man to receive rent for his undivided interest in a farm. We think it should have been clear to the agent, Van Houweling, when Den Hartog said to him, "We were wanting insurance," "we were intending to take insurance," "we would take the insurance," that Den Hartog intended and expected to insure the interests of both himself and Jabaai in the property. Now, concerning this conversation Van Houweling testified:

"He [Den Hartog] spoke something about his insurance, that they had talked of taking out on his farm. I could not state to the court that he said nothing about Jabaai having a joint interest in that property."

Further, in the conversation just before Den Hartog handed the old policy to Van Houweling, Den Hartog stated to Van Houweling that he could not recall the dimensions of the house, and said, "We bought the place, and I will take you over and we can fix it up then." We think the record shows that there was no evasion or concealment on the part of Den Hartog concerning the property, but that he did everything within his power to assist the agent in getting the data required. The

record does not disclose that any direct question was asked concerning the ownership of the farm. Van Houweling did not deem it necessary to go out to the farm, for he said to Den Hartog, ''If we only had the old policy, we could take everything from that,'' and further told Den Hartog that, if he would sign the application, that would let him off; that ''I [Van Houweling] could copy it off, the balance of what I needed, off the old application.'' In accordance with Van Houweling's request and instruction, Den Hartog signed the printed application in blank, without reading it. According to his testimony, it was the custom of Van Houweling to use old policies for the purpose of procuring data for writing up a new application. In the instant case, he used the old policy to procure the data to fill in the application which Den Hartog signed in blank. The old policy disclosed that Den Hartog and Jabaai had together purchased the farm from Peter Van Hemert.

Counsel for appellant argues that Den Hartog was negligent because he signed the application in blank. Complete answer to that argument is, we think, that Den Hartog signed the application in blank, without reading it, at the request of and in reliance upon the agent to properly prepare the application. What is said in *Fitchner v. Fidelity Mut. Fire Assn.*, supra, is illuminating, and we think controlling, on this proposition.

We think there can be no question but that it was the intention of the parties that the persons to be insured against loss of the building which burned were the owners thereof, Den Hartog and Jabaai.

We reach the conclusion that the evidence warrants reformation of the contract of insurance so as to include appellee Jabaai as a joint owner of the property with Den Hartog.

Judgment of the court below is affirmed.—*Affirmed.*

STEVENS, DE GRAFF, and VERMILION, JJ., concur.