P. F. CONRAD, Appellee, v. FARMERS MUTUAL HAIL INSURANCE ASSOCIATION, Appellant.

No. 43920.

JUNE 15, 1937.

Shaw & Shaw and McMartin, Herrick & Langdon, for appellant.

W. J. Allen and Whitney, Whitney & Stern, for appellee.

HAMILTON, J.—On July 3, 1933, the defendant company issued its policy insuring plaintiff's crops against loss by hail. Plaintiff sustained a loss on July 14, 1934. He sent notice of the loss to the company and three adjusters, Mr. O'Meara, Mr. Crouse, and Mr. Ford, came to the farm to adjust this loss. After intermittent negotiations extending over two or three days, a settlement was reached on August 13, 1934. Four days later another untimely hailstorm occurred and plaintiff sustained another loss.

The real bone of contention is whether the policy was cancelled when settlement was made on August 13th, or whether the plaintiff still had hail insurance when this second loss occurred four days later. The settlement was reduced to writing on a regular printed form, and there was written thereon in lead pencil these words: "$100 and assessment to date, policy cancelled this day." The company is standing on this writing, known in the record as Exhibit L, while plaintiff asserts the words "assessment to date, policy cancelled this day" were inserted by mutual mistake, fraud, or accident, and by way of cross petition asks that the writing be reformed to read "$100 and assessment paid for the year 1934", contending that this was the settlement agreed upon. The defense was a general denial and estoppel

830

based on neglect in failing to read the agreement before signing, and retention of the $100 check. The trial court granted reformation and the company has appealed from this decree.

Appellant contends that the court erred in granting the reformation (a) because plaintiff failed to prove a mutual mistake, (b) because the evidence showed that plaintiff could read and failed to read through his own negligence, and this negligence precludes any right to reformation of the contract; (c) that by accepting and retaining the $100 consideration for the settlement made with full knowledge of its terms, plaintiff is estopped from asserting that the agreement did not express the intent of the parties. Appellant cites many authorities in support of these propositions.

█ █ █ It must be said in all fairness, that aside from the writing, there was no evidence that the matter of *cancellation of the policy* and the matter of assessment *to date* was at any time mentioned in any of the negotiations between these parties. Ford and Crouse both testified that there was nothing said concerning either of these matters, that the agreement that they discussed was that the company would pay the plaintiff $100 and consider the premium or assessment for 1934 paid. Ford testified that after Conrad and the adjusters had reached this agreement as to terms, he told Conrad he would have to submit the same to the company, and that he called up Mr. Rutledge, the secretary of the company, and told him over the telephone that he could settle the loss by paying $100 cash and the assessment, and that Rutledge told him to go ahead and settle that way. Crouse was in the telephone booth when Ford called up Mr. Rutledge and heard Ford say to Rutledge that he could make the settlement on such terms. This was the settlement agreed upon. Rutledge did not take the witness stand and deny this. Rutledge, the secretary of the company, and the only one, apparently, who had authority to approve the settlement, knew nothing about this talk of cancelling the policy until after the settlement was made, for on the 14th day of August, the day after the settlement was made, Rutledge sent Conrad a notice of cancellation in which he stated: ''Take notice, therefore, that all liability of the Farmers Mutual Hail Insurance Association under said policy to you shall terminate upon the expiration of five days from the above date.'' On the 20th of August, 1934, Rutledge again wrote Conrad, in which letter he stated: ''I

have already notified you that we are cancelling your policy anyhow, and the cancellation that I had notified you of, if allowed to stand would have been five days from the date of the letter, but you appear to have taken this out of my hands and cancelled it in your settlement, and I am sending you a check for the $100, and allowing the policy to stand cancelled.''

This all goes to show that no one aside from O'Meara at the time the terms of the settlement were agreed upon knew anything about, or had anything to do with the matter of inserting in pencil the statement, ''assessment to date, policy cancelled this day.'' It was not in the oral agreement upon which the minds of the plaintiff and the adjusters had met and which was communicated to the secretary of the company and agreed to by him. Therefore, the writing did not express the true understanding. We think the evidence is clear, satisfactory and conclusive on this point, and unless Conrad is barred from seeking reformation because of his negligent conduct in failing to read the contract of settlement, or is estopped because he retained the uncashed check, the court was right in granting the reformation. It should perhaps be said at this point that the $100 check was retained but never cashed, and this action is to recover the loss caused by the hail storm for which settlement was made and also the second hail storm, the plaintiff in his pleadings admitting the receipt of the $100 check and expressing his willingness to credit the same on the total loss.

Looking now to the issue of estoppel, let us examine some of our prior decisions touching this phase of the matter. In the case of Betz v. Swanson, 200 Iowa 824, 828, 205 N. W. 507, 509, we had under consideration this question of negligence in failing to read and understand what was contained in a written instrument, and in that case the same defense was urged as is being urged by the defendant company in the instant case, and the court said:

''Based upon the evidence showing this transaction, appellant argues that appellee is estopped by the negligence of himself and his attorney from having a decree of reformation upon any of the grounds stated. This is perhaps the most troublesome question in the case. Appellant cites a large number of decisions of this court to sustain his plea of estoppel. Roundy v. Kent, 75 Iowa 662, 37 N. W. 146; McCormack v. Molburg, 43

Iowa 561; McKinney v. Herrick, 66 Iowa 414, 23 N. W. 767; Wallace v. Chicago, St. P. M. & O. R. Co., 67 Iowa 547, 25 N. W. 772; Reid, Murdock & Co. v. Bradley, 105 Iowa 220, 74 N. W. 896; In re Estate of Patterson, 199 Iowa 362, 202 N. W. 8; Houchin v. Auracher, 194 Iowa 606, 190 N. W. 3. The negligence charged in each of these cases was the failure of the complaining party to read or otherwise familiarize himself with the contents of an instrument signed by him. The strict rule of these cases is not to be applied here, although negligence may, in a proper case, be invoked, to prevent the reformation of a written instrument. The rule applicable to cases such as we are considering, as stated in Snyder v. Ives, 42 Iowa 157, is as follows:

'The law requires only reasonable diligence, and requires this to the end that culpable negligence may not be encouraged.'

"See, also, Latimer v. Jones, 55 Iowa 503, 8 N. W. 327; Jackman v. Herrick, 178 Iowa 1374, 161 N. W. 97; Lundean v. Hamilton, 184 Iowa 907, 169 N. W. 208; Pomeroy's Equity Jurisprudence (3d Ed.) section 856.

"It must be conceded that appellee had full opportunity to examine the deed and to know its contents; but he also had a right to rely, to some extent at least, upon the agreement as to what its terms should be."

In the case In re Estate of Patterson, 199 Iowa 362, 366, 202 N. W. 8, 10, the same proposition was under consideration, and the court said:

"It is clearly a case where, through a mutual mistake, the written instrument signed does not embody the actual agreement of the parties. That equity will grant relief in such a situation is elementary. Stafford v. Fetters, 55 Iowa 484, 8 N. W. 322; Hausbrandt v. Hofler, 117 Iowa 103, 90 N. W. 494, 94 Am. St. Rep. 289; Brown v. Ward, 119 Iowa 604, 93 N. W. 587; Coleman v. Coleman, 153 Iowa 543, 133 N. W. 755; Hyde Park Inv. Co. v. Glenwood Coal Co., 170 Iowa 593, 153 N. W. 181.

"It is urged, however, that J. H. Patterson was guilty of such negligence in signing the agreement without reading it as to require that his prayer for a reformation of the instrument must be denied. It is frequently said that one who has the opportunity to inform himself of the contents of a written in-

strument by reading it or having it read to him, and is not prevented from so doing by the fraud of the other party, but signs it in ignorance of its contents, is guilty of such negligence as will prevent a reformation of the instrument at his suit. The rule finds proper application in many cases. But where the actual contract and intention of the parties are clearly established, and it is so shown that the writing fails, because of a mutual mistake of the parties in drafting it, to express the true contract, the parties are both negligent, and it is immaterial whether their negligence resulted from the failure of one. or both to read the contract. Merriam v. Leeper, 192 Iowa 587, 185 N. W. 134. See, also, Welch v. Johnson, 93 Ore. 591, 183 Pac. 776, 184 Pac. 280; Cox v. Hall, 54 Mont. 154, 168 Pac. 519.''

In this same connection we quote from the case of Steele v. Kluter, 204 Iowa 153, 158, 214 N. W. 522, 524:

''It is true that negligence may prove fatal to one who puts his name to a writing, without ascertaining the contents thereof. But even negligence is a question of degree of care. The line of demarcation between reasonable diligence and some degree of negligence is not always clearly defined. Generally speaking, it can be said that some degree of negligence enters into all cases where a writing signed by the parties fails to express their real intention. It is not the purpose of equity to put a premium on negligence, nor to exercise its powers to cure the result of mere negligence. But even negligence may have its mitigations, and failure to discover is not always inexcusable in equity; and this is especially so as between the original parties to the transaction. Where the equities are clear, the court will not lightly refuse relief because of some degree of attendant negligence. The rule in that regard is considered by us in Betz v. Swanson, 200 Iowa 824, 205 N. W. 507.''

■■■ The equitable doctrine announced in the foregoing cases is especially applicable to insurance contracts. In the case of Den Hartog v. Home Mut. Ins. Assn., 197 Iowa 143, 147, 196 N. W. 944, 945, this court said:

''Courts have recognized the fact that the insured ordinarily relies upon the agent to properly set out in the application the facts given him. Fitchner v. Fidelity Mut. Fire Assn., supra;

Pfiester v. Missouri St. Life Ins. Co., 85 Kan. 97 (116 Pac. 245, L. R. A. 1915A, 275, note).

"It is universally held, so far as we have discovered, that the insurer will not be permitted to avoid the policy by taking advantage of a misstatement in the application, material to the risk, which is due to mistake or negligence of its agent, and not to fraud or bad faith on the part of the insured. Young & Co. v. Hartford Fire Ins. Co., 45 Iowa 377, 24 Am. Rep. 784; Stone v. Hawkeye Ins. Co., 68 Iowa 737, 28 N. W. 47, 56 Am. Rep. 870; Dodge v. Grain Shippers' Mut. Fire Ins. Assn., 176 Iowa 316, 157 N. W. 955."

 It is plainly evident from the record in this case that the insured had placed great faith and confidence in O'Meara. In the earlier stages of the negotiations, when the question of arbitration was mentioned, O'Meara was the man Conrad first picked to represent him, although he was at that time an agent of the company. He was told this would not be permissible and he then suggested another. O'Meara had knowledge of this confidence that the insured was placing in him, as did both the other representatives of the company. The record is such as to suggest the inference that it was for this reason that O'Meara was put forward to close the settlement with Conrad, for up to that time the others had done most of the talking. O'Meara admits in his testimony that he heard no talk of cancellation of the policy in any of the negotiations up to the time he took the book which contained the agreement of settlement and approached Conrad for his signature, stating to Conrad that it was necessary that he execute a "proof of loss". In all fairness, O'Meara should have mentioned this matter of cancellation, and his failure to do so under the circumstances in this case rises very nearly, if not wholly, to the point of constructive fraud. This all took place on a busy day of threshing at the Conrad farm. Conrad was attending to taking the threshed grain away from the machine when the adjusters arrived that morning. He was quick to inform them that he had no time to talk about settlement or arbitration. The writer of this opinion spent his entire youth on the farm, and even during the thirty-five years in which he has engaged in the practice of law, has seldom failed to take time out to at least look on at threshing time out on the home farm. He is therefore quite appreciative of the

situation in which Mr. Conrad found himself in attempting to take the grain from the threshing machine, and at the same time adequately look after his interests in adjusting an insurance loss with three alert insurance adjusters who had nothing to do except to sit in the shade and get in a word edgewise with Mr. Conrad as he was able to momentarily relax his attention on the task before him. Necessarily, the details of this settlement under the circumstances were left to Mr. O'Meara. The matter inserted by lead pencil was an important element in the settlement. Under Conrad's theory he would have had insurance on his crops for the remainder of the year 1934, fully paid up. Under O'Meara's theory of the settlement, Conrad was left without hail insurance on his crops.

The plea of estoppel based on the retention by Conrad of the $100 check is not supported by proof of the necessary elements constituting equitable estoppel. What loss, harm or injury has the company suffered, or in what manner have they changed their position? In this case, both parties have in their pleadings asked the court to do equity, and in accomplishing this most desirable purpose, which should be the goal in all equitable actions insofar as possible within the law, we think the trial court in his interpretation and construction of the fact situation in this case was right when he said: "These facts should be kept in mind. The witness O'Meara, who was then an agent of the defendant company on his own motion, without instructions from the company, without even letting his co-workers, who were assisting in securing this settlement with the plaintiff, know that he was doing so inserted into this contract the words to which the plaintiff now objects. He returned to plaintiff's farm where he knew plaintiff was busily engaged with threshers at work threshing his grain. The plaintiff Conrad had known O'Meara for some time and we may reasonably assume from the testimony that he had confidence in O'Meara. O'Meara having written into this contract, 'assessment to date, policy cancelled this day' knowing that neither of these matters had been mentioned in the former talks of settlement, simply called the plaintiff Conrad from his work at the threshing machine, told him they would settle the loss but he must sign *proof of loss*. And he told him nothing more. He accepted plaintiff's signature to the contract when he must have known from the circumstances there existing that plaintiff had not read the contract. We are

836

clearly of the opinion that under these circumstances and conditions the plaintiff should not be held to that degree of negligence which would preclude or estop him from now asking this reformation.''

The only thing in the foregoing quotation from the findings of the court which is not fully borne out by the record is the statement, ''and he told him nothing more.'' O'Meara did testify that he told him what was in the contract, but later said that as to what was actually said he would have to depend entirely upon the terms of the written contract itself. When asked directly whether he did or did not mention the matter of cancellation to Conrad, O'Meara was unwilling to answer either yes or no. Insofar as Conrad and the company itself, as represented by its secretary and manager, Mr. Rutledge, are concerned, the contract agreed upon did not contain the language inserted by O'Meara. Therefore, its insertion was a mutual mistake, and we do not believe the company should be permitted to take advantage of this unwarranted action of its agent in inserting an element which had been no part of the negotiations between the parties, and which was not known by the company until after the settlement had been fully made, and concerning which the insured was in no way advised, and which, because of the manner in which the matter was presented to him, he had no reason to suppose was anything other than a *proof of loss* of the damage.

On the whole record we are inclined to let the ruling of the trial court stand, and the case is accordingly affirmed.—Affirmed.

RICHARDS, C. J., and all Justices concur.